UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MELISSA BRADLEY,<br><br>*Plaintiff,*<br><br>v.<br><br>TIDES, INC.,<br>1014 Torney Avenue<br>San Francisco, CA 94129,<br><br>*Serve Registered Agent:*<br><br>Amanda Keton, Esq.<br>1014 Torney Avenue<br>San Francisco, CA 94129<br><br>*Defendant.* | Civil Action No.: 1:14-CV-00063 |

**COMPLAINT FOR EQUITABLE
AND MONETARY RELIEF AND DEMAND FOR JURY TRIAL**

**INTRODUCTION**

Plaintiff Melissa Bradley ("Bradley" or "Plaintiff") brings this civil complaint of unlawful discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* against the Defendant, Tides, Inc. ("Tides" or "Defendant").

**JURSIDCTION AND VENUE**

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this is an action arising under the laws of United States, specifically, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*

2. Plaintiff Bradley has exhausted the administrative remedies available to her under 42 U.S.C. §§ 2000e, *et seq.* The United States Equal Employment Opportunity Commission

1

issued Bradley a Notice of Right to Sue on October 21, 2013. This Complaint and Demand for Jury Trial is timely filed within the ninety day period afford by 42 U.S.C. §§ 2000e-5(f)(1).

3. This Court has personal jurisdiction over Tides because Tides regularly transacts business and has regular contacts in the District of Columbia.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all or a substantial portion of the unlawful employment practices occurred within this judicial district, which was the primary location of Bradley's employment with Tides.

## PARTIES

5. Bradley is a citizen of the United States and is domiciled in Maryland. Bradley maintains an address in Washington, D.C.

6. Tides, Inc. is a California corporation with its headquarters in San Francisco, CA and offices in Washington, D.C. and New York, N.Y.

## FACTUAL ALLEGATIONS

7. Bradley is a 45-year-old African American woman and she was Chief Executive Officer ("CEO") of Tides from November 1, 2010, until April 10, 2013.

8. Tides is headquartered in San Francisco, CA; however, Bradley worked primarily in Washington, D.C. in its offices located at 1900 M Street, NW, Suite 500, Washington, DC 20036.

9. Prior to her employment with Tides, Bradley earned her Bachelor of Science degree in finance from Georgetown University in 1989, and her Masters of Business Administration in Marketing from American University in 1993.

10. Bradley also served on the Board of Directors for various enterprises including, *inter alia*, Tides, Victory Fund, the Corporation for Enterprise Development, Green America, and the Georgetown Board of Governors.

11. Tides initially recruited Bradley in or about 2007 to serve in a non-compensated position on the Board of Directors at the request of Tides' CEO, Drummond Pike.

12. Pike resigned in 2010, and Pike along with some of Tides' staff encouraged Bradley to serve as Tides' new CEO.

13. Tides hired Bradley as its CEO on or about November 1, 2010, and Bradley's goals as CEO were to, *inter alia*, do the following: (1) foster an environment throughout Tides that produces high performance and energy from and within staff and Board; (2) manage staff, board, and finances toward the successful implementation of the Business Plan; (3) manage annual budgeting and planning to achieve approved annual budget; (4) lead fundraising campaign in partnership with the Board; (5) build and sustain an organizational structure that provides opportunity for success, pride, and quality performance as measured by HR survey; (6) maintain core services and sustain current lines of business with analysis and improvement on profitability and service; (7) support and sustain trust and transparency with key stakeholders; (8) support a strategic board that is mobilized towards business plan goals; and (9) build a strong executive leadership team that is sustainable and can help build the right culture for Tides' success.

14. Within the first few months as CEO, Bradley heard and learned of disparaging comments made by Tides' staff members about her race, including China Brotsky's, the Senior Vice President, statement that Bradley was only selected as CEO due to her race.

15. On March 26, 2012, Bradley informed Tides' Board of the racial comments, and that she felt subject to a hostile work environment. The Board recommended that the staff engage in diversity training, but the training programs were out of the budget for 2012 and delayed until 2013. However at the time of Bradley's termination no diversity training had been scheduled.

16. In or about 2012, Nick Hodges served as Tides' Chief Operating Officer ("COO") and interim Chief Financial Officer ("CFO"), and Bradley initially worked closely with Hodges.

17. Eventually, however, Hodges' performance diminished, and he would not update Bradley regarding his work and would not complete tasks within the necessary time frame.

18. In or about February 2013, several staff members reported concerns about Hodges' conduct to Bradley, and Bradley issued Hodges a negative performance review for his failure to fulfill his role as COO while also serving as CFO.

19. Moreover, Bradley's assistant, Kim Sarnecki, reported that Hodges was "loose around the lips" about sexual comments, and Marek Stareb, a Tides employee in the IT department, also reported that Hodges engaged in inappropriate discussions.

20. Bradley informed Stephanie Clohesy, the Chairwoman of the Board, about Bradley's concerns with Hodges, and Clohesy told Bradley to the effect of "If there is a way to make it work, then do so. We know Tides staff is privileged." Clohesy was implying the Board did not want to see Hodges leave Tides.

21. Jason McMillan, the Senior Vice President of Human Resources at Tides, also informed Bradley that Hodges had sexually harassed him by approaching him from behind and grabbing him around the waist while making inappropriate gestures and in response Bradley

decided to initiate a formal investigation into Hodges' conduct. Within one week thereafter Hodges announced his resignation.

22. Hodges alleged that he was resigning due to "communication challenges" despite the upcoming HR investigation into his conduct, and after Hodges announced his resignation he wrote a letter to Tides' Board making unfounded allegations against Bradley.

23. During this time, Bradley also suggested to the Board that Tides should conduct an external review of the organization to assess Tides' morale and leadership, but Clohesy rejected Bradley's suggestion.

24. Instead, shortly after Hodges wrote his letter to Tides, Tuti Scott, Chairwoman of the Tides Personnel Committee, informed Bradley that Tides was going to conduct a 360 degree review of Bradley's performance.

25. Tides hired Donna LoPiano, a consultant and Scott's close friend, to conduct the 360 review.

26. Scott and Clohesy asked Bradley to submit questions and a list of potential witnesses for them to review, but the 360 degree review did not focus on the issues Bradley submitted, and instead, the 360 degree review was written in a biased way to validate all the issues raised in Hodges' letter to the Board. LoPiano also phrased the questions in the 360 degree review to prompt negative responses.

27. Moreover, the 360 degree review asked those taking the survey to agree or disagree to a list of negative statements which LoPiano represented as "behaviors or practices that Bradley should cease doing to increase success."

28. For example, some of the list of behaviors or practices included in the review asked the following: "stop adding expensive staff/programs w/out identification of new

revenues/budget adjustment," "actively creates culture that divides and mistrusts resulting in fear/divisiveness," and "dissatisfaction with employee performance needs to result in constructive feedback rather than criticism or expressions of disappointment."

29. Very few, if any, of the topics raised in the 360 degree review evaluated Bradley's performance related to her goals, but yet from on or about March 30, 2013 to on or about April 4, 2013, LoPiano conducted interviews.

30. About half of the staff interviewed for the review did not report to Bradley for the majority of 2012 and five interviewees had only recently transferred to Bradley after Hodges' resignation, but on or about April 5, 2013, LoPiano submitted the outcome of the 360 degree review to Bradley.

31. Thereafter Scott notified Bradley on or about April 7, 2013 that Tides was terminating her employment, and Scott cited financial reasons unrelated to Bradley's direct responsibilities and the 360 review process as reasons for terminating her.

32. On or about April 8, 2013, Clohesy informed Bradley that her successor had been recommended, and Bradley later learned that Gary Schwartz, a male, had already been recommended to serve as acting CEO prior to Bradley being notified of her termination.

33. Scott presented Bradley with a separation agreement on or about April 10, 2013.

34. Prior to issuing the separation agreement to Bradley, LoPiano had been asking Tides' staff about how they felt about Gary Schwartz as a CEO, and Tides replaced Bradley with a male, Gary Schwartz, as CEO prior to even terminating Bradley's employment.

35. Tides treated Bradley in an inferior manner to her male counterparts. For example, Tides attempted to retain another man, Henry Tang, as CFO between 2011 and 2012 despite Tang's prior poor behavior and financial malfeasance that was both documented and

corroborated. Tides' employees also reported multiple concerns to Bradley about Tang's behavior while he was CFO.

36. For example, employees reported to Bradley the following incidents: (1) Tang got into an altercation with a former staff member over that person's capabilities at work during a party; (2) a staff member was absent from work for a period of time and returned with a doctor's note stating that she had PTSD from Tang yelling at her and embarrassing her in front of her co-workers; and (3) Tang was in a car with a staff member and having an argument and the staff member tried to exit the car but Tang reached across the car and physically prevented her from leaving.

37. Bradley and Tides' HR Department disclosed some of these incidents to the Board, and a male Board member, Peter Mellen, stated: "If there is any way you can keep [Tang], I strongly encourage you to do so."

38. Mellen asked Bradley twice to keep Tang by asking to the effect of: "if [Bradley] could make it work…he would appreciate it." Afterwards Mellen asked Bradley on several occasions about the status of Tang's employment, and Mellen eventually had to be reminded by HR of his role as a board member and to not contact Tang regarding Tang's employment with Tides.

39. Bradley also discovered that Tang had obscured an accounting error that resulted in an approximately $120,000 overpayment to an organization Tides supported and she learned that Tang instructed subordinates to refrain from disclosing the error to Bradley. When Bradley questioned Tang about the error, Tang stated he did not understand why it was a "big deal."

40. Nevertheless Mellen and the Board continued to try to retain Tang as CFO, and Tides also permitted Hodges, another male, to serve out his resignation period despite accusations of misconduct against him.

41. However, Tides terminated Bradley's employment without any reconsideration or efforts to continue same as it had done for her male counterparts.

## COUNT I
### Title VII of the Civil Rights Act of 1964
### 42 U.S.C. § 2000e, *et seq.*
### Discrimination

42. Bradley hereby incorporates the allegations set forth in the preceding paragraphs as though fully alleged herein.

43. Bradley is a "person" and an "employee," and Tides is an "employer" as defined in 42 U.S.C. § 2000e.

44. Bradley is an African-American woman.

45. Bradley had a record of good performance and met expectations at all relevant times prior to Tides' discrimination.

46. On April 7, 2012, Tides notified Bradley her employment was being terminated after she reported discrimination to Tides' Board and underwent a biased 360 review and report.

47. Tides terminated Bradley's employment wholly or partially based on her gender, and Tides treated Bradley worse than similarly situated male employees who had committed financial malfeasance and/or made inappropriate sexual comments and gestures in the workplace based on her gender and her opposition to inappropriate sexual comments and behaviors. Tides sought to retain those similarly situated male employees, but terminated Bradley's employment without reconsideration.

48. Bradley has and will sustain substantial monetary and non-monetary damages as a result of Tides' discrimination.

## COUNT II
### Title VII of the Civil Rights Act of 1964
### 42 U.S.C. § 2000e, *et seq.*
### Retaliation

49. Bradley hereby incorporates the allegations set forth in the preceding paragraphs as fully alleged herein.

50. Bradley is a "person" and an "employee," and Tides is an "employer" as defined in 42 U.S.C. § 2000e.

51. Bradley engaged in a protected employee activity by reporting gender and race harassment to the Board on March 26, 2012.

52. In or about February 2013, Bradley initiated and participated in a formal investigation against Hodges for allegations made against him for sexual comments, inappropriate discussions, and sexual assault.

53. Following Hodges' resignation, Bradley went through a 360 review that was written and administered in a biased manner. In Bradley's response to the review, Bradley again voiced concerns about biased treatment based on her gender and race.

54. On April 7, 2013, following the 360 review, Tides informed Bradley that Tides was terminating her employment, approximately one year after Bradley's protected activity.

55. Bradley has and will sustain damages because of Tides' retaliatory acts.

**PRAYER FOR RELIEF**

Based on the foregoing claims, Bradley respectfully requests the Court enter judgment her favor and award her the following relief:

a. Reinstatement with the same seniority status, duties, and working conditions applicable at the time of her termination, and abatement of the retaliatory conduct directed toward her, or alternatively, front pay;

b. Economic damages for lost wages and benefits;

c. Pre-judgment interest;

d. Compensatory (non-economic) damages, including damages for mental and emotional distress and harm to reputation;

e. Punitive damages as may be determined at trial;

f. Costs and reasonable attorneys' fees; and

g. Any other just and equitable relief this Court deems appropriate.

Respectfully submitted,

*Nicholas W. Woodfield* /NH with permission
R. Scott Oswald
soswald@employmentlawgroup.com
Nicholas Woodfield
nwoodfield@employmentlawgroup.com
THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2812 (telephone)
*Counsel for the Plaintiff*